

FILED & ENTERED

NOV 16 2009

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY williams   DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

In re:

MALEK AND CHAHAYED CHIROPRACTIC

CORP.,

Debtor(s).

Case No: 1:09-bk-21967-MT

Chapter: 7

**Memorandum of Decision**

**re: Dismissal**

Date: November 3, 2009
Time: 1:00 PM
Location: Courtroom 302

## MEMORANDUM RE: REMAND MOTION AND ORDER TO SHOW CAUSE WHY BANKRUPTCY CASES SHOULD NOT BE DISMISSED

There are currently three matters pending which raise the question of when a bankruptcy court should supplant ongoing activity by a receiver in a state court proceeding. The first case, Malek and Chahayad Chiropractic, case no. 09-21967, is a voluntary Chapter 7 bankruptcy and was filed on September 11, 2009.   The second case, Choice Providers Medical Group, case no. 09-22454, is an involuntary Chapter 7, and was filed on September 23, 2009.  The third matter is an adversary proceeding, 09-01407, removed to this court on September 28, 2009, by one of the principals of the Malek and Chahayed Chiropractic voluntary case.

On September 30**,** 2009, the court issued orders to show cause as to whether these matters were properly in this court or whether these matters should be dismissed so that the

state court could proceed.  Hearings were held on October 29, 30 and November 3, 2009.  The

following witnesses testified in the course of those hearings: Elizabeth Manahan, Ruth Bell,

Kevin Jenkins, Sylvia Morales, Jeffrey Chavez, Dee Steine, Alan Davidoo, Jeffrey Sumpter

and David Pasternak. The discussion below is based on the testimony provided by these

witnesses, all declarations filed by the various parties and the briefs submitted by the parties,

all reflected on the dockets of these cases.


Background

These matters arise out of a failed business partnership between two doctors. Hany

Malek, a chiropractic doctor, and Michael Koshak, a medical doctor, each of whom owned a

portion of Choice Providers APC ("Choice").  Choice provided medical care to individuals who

suffered work related injuries.  In addition to their interest in Choice, each party had other

practices and companies.  The relationships among these other entities are quite complex and

intertwined, and the testimony indicates that employees of Choice and the Malek-owned

entities sometimes treated the different entities interchangeably.  Koshak treated patients at

other facilities.  Malek owned Malek and Chahayad Chiropractic d.b.a United Health Care

("M&C"), and 17750 Sherman Way, LLC ("Sherman Way LLC").  M&C provided chiropractic

services and was co-located in all locations occupied by Choice. M&C also had its own

locations. Sherman Way LLC owned a piece of property that Choice and M&C occupied.


On October 16, 2008, Koshak and Choice filed an action against Malek and Malek

owned entities. The action alleged that Malek had stolen Koshak's identity and taken out loans

in his and Choice's names.  After filing the complaint, Koshak allegedly began to remove

Malek from his board positions at Choice and to shut down Choice.  Malek resisted his

removal and, on November 7, 2008, Malek filed an ex parte application in Los Angeles

Superior Court for a restraining order to prevent Koshak from continuing Choice's wind down.

The court entered an order that limited Koshak's attempts to wind down Choice. On November

10, 2008, Malek returned to court alleging that Koshak continued the wind down in

contravention of the court's order. The court issued restraining orders that prevented further

wind down and prohibited further interference with Choice. On December 19, 2008, the court

appointed David Pasternak ("Pasternak") as receiver for Choice and ordered him to conduct a

forensic accounting to determine the ownership and assets of the business. The court also

ordered Pasternak to collect all rents, profits and income due to Choice; preserve and operate

the business; file tax returns; prosecute and defend lawsuits; and pay creditors in the ordinary

course. The court gave Pasternak sole authority to operate Choice until further order of that

court.(See Exhibit 13 to the receiver's testimony.)


State Court Actions After Appointment of Receiver

Upon takeover, the receiver attempted to run Choice. The state court pleadings indicate

that the receiver had trouble running Choice because Koshak and Malek interfered. The

receiver requested that the state court issue orders to show cause against both Koshak and

Malek. The receiver's pleadings indicate that Koshak refused the receiver's request to continue

appointing a physician to insurance panels, deactivated Choice's equipment and actively

prevented the receiver from receiving funds from the Medicare program. The receiver, in his

motion for an order to show cause, indicated that Koshak's actions cost Choice hundreds of

thousands of dollars. Koshak later ceased interfering with the receivership, and the receiver

withdrew the motion for an order to show cause.


The receiver also filed a motion for an order to show cause against Malek. The receiver

alleged that Malek set up a new company, Heritage. The receiver alleged that Heritage, and

other Malek controlled entities, took all of Choice's billing records and used the information to

prepare and submit their own invoices and for services that Choice performed.  The receiver

alleged that these actions effectively diverted much of Choice's stream of income to Malek

controlled entities. The receiver also alleged that Malek attempted to convince doctors working

for Choice to quit and work for his entities. The receiver alleged that these actions diverted

hundreds of thousands of dollars from the receivership.


This contempt hearing, against Malek, was scheduled for September 30, 2009.  On

September 2, 2009, the receiver made an ex-parte application to expand the receivership to

M&C Chiropractic, Heritage, other Malek controlled entities, and Malek's personal bank

accounts. The court granted the request. On September 11, 2009, M&C Chiropractic filed a voluntary bankruptcy petition.

The receiver, in addition to collecting on accounts and running Choice, is responsible for conducting a forensic audit, paying assessed taxes of $450,000, and settling approximately 15 lawsuits brought against Choice. The receiver's monthly reports indicate that the receiver settled some lawsuits but that he did not resolve major suits. The receiver's reports indicate that the lack of money in the receivership prevented the receiver from accomplishing these goals. The receiver incurred approximately $350,000 in expenses through the end of July and significant additional sums since then. None of these expenses have been paid.

To pay these expenses, Choice has $10,000 in its bank account. Exhibit 5 to Mr. Sumpter's testimony indicates that Choice might have $6,000,000 in accounts receivable, and much of the dispute here concerns whether these receivables are collectable. The receiver indicates that he is attempting to bring hundreds of thousands of dollars into the estate by pursuing Malek for the funds allegedly diverted from the receivership. There do not appear to be any other potential assets of any significance.

Applicable Legal Standard

The question before this court is whether these bankruptcy cases and the removed adversary proceeding should remain in bankruptcy or whether all parties will be better served by this court dismissing and remanding some or all of above proceedings. The general rule is that a court should hear all cases properly before it, and only abstain in extraordinary circumstances. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 715 (1996). Bankruptcy courts are, however, courts of limited jurisdiction, and in some cases all parties would be better served by a bankruptcy court declining jurisdiction. The Bankruptcy Code gives a bankruptcy court limited authority to decline jurisdiction.

Section 305(a)(1) authorizes a court to dismiss or suspend proceedings if such action is in the best interests of creditors and the debtor. A court must consider the totality of the

circumstances, and make specific and substantiated findings that the interests of creditors and the debtor will be better served by the suspension or dismissal. *Weschsler v. Macke International Trade, Inc.(In re Macke International Trade, Inc.)*, 370 B.R. 236, 247 (9th Cir. B.A.P. 2007). Courts applying §305(a)(1) look to: whether a state court receivership has proceeded so far that it would be duplicative to proceed in a bankruptcy case, whether the case was filed for a proper purpose and any other factors relevant to the particular situation at issue. *In re Orchards Village Investments, LLC*, 405 B.R. 341, 351 (Bankr. D.Or. 2009)(looking at seven factors to determine whether it should abstain from hearing the bankruptcy petition); *In re Globo Comunicoes Participacoes S.A.*, 317 B.R. 235 (S.D.NY 2004)(finding that a minority of creditors were attempting to force the debtor into bankruptcy even though out of court restructuring would benefit the majority of creditors and the debtors); *In re O'Neil Village Personal Care Corporation*, 88 B.R. 76, 79-80 (Bankr. W.D.PA 1988) (dismissing a case when a state court receiver had been in place for a long time prior to the bankruptcy, and the bankruptcy had been filed by owners that had depleted corporate assets).

Section 1452(b) of title 28 authorizes a court to remand a removed case on any equitable ground. The grounds for remand under §1452(b) are similar to the grounds for discretionary abstention under 28 U.S.C. §1334(c)(1). *Compare Citigroup, Inc. v. Pac. Inv. Mgmt. Co. (In re Enron Corp.)*, 296 B.R.505, 508-09 n.2 (C.D.CA 2003) and *In re Tucson Estates, Inc.*, 912 F.2d 1162 (9th Cir. 1990). A court considering remand must consider the totality of the circumstances. *See In re Tucson Estates, Inc.*, 912 F.2d at 1167. Specifically, the court should consider the (1) effect of remand on efficient administration of the estate, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficult or unsettled nature of the applicable law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. §1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters, (9) the burden on the bankruptcy court's docket, (10) the likelihood that bringing the case in bankruptcy court

involves forum shopping, (11) the existence to a right to a jury trial, and (12) the presence of nondebtor parties. *Id.*


Because the facts and parties related to these matters are all interrelated, the two bankruptcy cases and the adversary proceeding must be discussed together.  It appears that before any payments to creditors can be commenced, a determination must be made as to which of these many entities owns the accounts receivable of each of the debtors.  Choice petitioning creditors have filed an involuntary petition and naturally want to be paid, but no payment from Choice can occur until it is determined if Malek and Malek owned entities siphoned off Choice's receivables.  Malek and Chahayad Chiropractic also seeks to pay creditors, but they may not be paid out of assets that were allegedly stolen from the Choice estate. This thicket is also at the core of the Superior Court action that was removed to this court.


Receiver's Knowledge

One of the most compelling factors in determining whether a receiver should continue with a case or if the bankruptcy trustee should take over is how long the receiver has been operating a business before the bankruptcy was filed.  Choice is being run and has been run for the past ten months by a state court receiver. This state court receiver has worked to prevent dissipation of Choice's assets and worked towards recovering assets for the benefit of creditors. Malek claims that the receiver is engaged in a vendetta against him and is only interested in his own fees.  Malek, has, however, never filed these complaints or even responded on the merits to the receiver's allegations in the Superior Court.  Based on the evidence before this court, there is no evidence to support Malek's claims.


David Pasternak, the receiver, testified and answered all questions any party to these proceedings put to him.  Pasternak is a highly qualified receiver and has been appointed in over 300 receiverships of various kinds and complexities.  His testimony was knowledgeable, credible, fair, and balanced.  He has worked with trustees in many bankruptcy cases and has

been left in as a receiver in a number of bankruptcy cases, so he is familiar with how a bankruptcy case compares to a state court receivership.

M&C has not been run by the receiver until recently. It was brought under the control of the receiver only a week before the M&C bankruptcy filing based on an application to the Superior Court demonstrating that assets from Choice may have been diverted to M&C and other Malek-controlled entities.  M&C appears to have shared employees, locations and a computer billing system with Choice, however, so the receiver had knowledge of M&C's business for longer than the week before the bankruptcy filing.

There are over twenty employees involved in running Choice and M&C.  They have specialized knowledge of both operational and financial aspects of these businesses.  There has been a steep learning curve on what the computer billing system's limitations are and how it may have been tampered with.  The receiver has already brought in Kevin Jenkins as Director of Operations. Mr. Jenkins has twenty years of experience in health insurance and billing practices.  Mr. Jenkins appears to have a good understanding of the legal requirements related to health care billing and has spent some time trying to understand what the Raintree computer billing system did and was supposed to do for Choice and M&C.  If there were diversions of any receivables, Jenkins has already commenced the work necessary to determine that.   The court found Kevin Jenkins credible and knowledgeable.  He is an independent third party brought in to establish proper current billing practices and determine what happened to previous receivables.  Medical billing is a specialized area.  In order to properly account for the receivables, the receiver had to determine how a multitude of related companies carried out the medical billing.

By all accounts, it was not easy for an independent party to assume control of these two businesses.  Ms. Morales' testimony illustrates some of the difficulty the receiver had carrying out his orders.  The court finds Ms. Morales' assertion that the receiver owes her back pay credible, but that she was evasive and not credible in other areas. Specifically, she denied having any personal relationship with Dr. Malek, but admitted that she took a trip to Las Vegas

with him.  While she clarified that they stayed in separate rooms, she appeared to minimize her loyalty to Malek during her testimony.  Based on how she answered questions and her description of the billing systems and records, it also does not appear that she was terribly helpful to the receiver in assuming control of Choice.

The receiver's attempts to take control of these two businesses have been obstructed by a break in at the M&C offices and a lack of cooperation in providing necessary passwords to the computerized billing system.  The receiver's report details the receivership's computer problems.  The report indicates that the receiver had to copy all of Choice and M &C's servers, crack passwords to computers because Malek and Joseph Marquez provided incorrect passwords, and re-image new computers with the server information. The report also indicates that somebody, with access to the building, broke into the computer room to steal external hard drives, disable encrypted servers, disable the re-imaged server and turn off uninterruptible power supplies. (See Exhibit 12 to the receiver's testimony.) The receiver has had to employ a computer expert to access the records.  Despite these obstacles, the receiver has now obtained control of significant records and has been reconstructing the files and receivables to determine which assets are owned by which of these various entities.

The M&C voluntary petition is similar to other cases where bankruptcy courts have dismissed the bankruptcy to allow the receiver to proceed.  See *In re O'Neil Village Personal Care*, 88 B.R. 76 (Bankr. W. D. Pa. 1988).  In that case, the owners filed a voluntary petition to defeat a receiver. The receiver in that case had been in place almost a year and had conducted a forensic audit. The principals in that case had already been found liable for converting trust accounts and violating multiple court orders. In the instant case, the receiver has accused Malek of stealing from Choice, but the state court has not been able to determine the ownership of the receivables in each business because of the difficulties the receiver has encountered.  While the receiver has only administered the voluntary debtor, M&C, for about a week, the key issues to be resolved in M&C are the same issues that have been at issue for many months in the receivership. Any Chapter 7 trustee in either of these cases would have to attain the level of detailed knowledge the receiver already has about these businesses and the

alleged diversions.  As with *O'Neil*, "this is as clear a case of duplicative effort as this Court can imagine." 88 B.R. at 80.


Status of Superior Court Proceedings

Malek claims that the state court has not acted in the main case and, instead, all state proceedings have centered on the contempt proceedings, restraining orders, appeals and preliminary injunctions.  The record of the state court proceedings does not support this assertion. The state court proceedings have been ongoing for almost a year.  There have been ten different hearings.  There have been significant decisions governing the role of the receiver and preparing the case for trial as the receiver attempts to determine ownership of the various assets of Choice and M&C. Malek asks this court to effectively re-visit these decisions and overturn the actions of the state court in approving the receiver. While this is unusual in that the state court originally appointed the receiver in response to Malek's TRO request, this court does not sit as a court of appeal for the Superior Court.  Malek is seeking to have this court protect him from the receiver's demands. The court has reviewed a disk including extensive pleadings in the state court.  Malek has made various arguments to the Superior Court which have been rejected.


Essentially, this entire dispute could have been resolved shortly after December 19, 2008, if there had been cooperation with the receiver.  At that point, his mandate was to conduct a forensic investigation and to report to the State Court about Choice's financial affairs from the time when Koshak and Malek began operating the business together. This relatively simple dispute has now been complicated immeasurably and many unfortunate and completely uninvolved creditors have not been paid because of it.


While the Superior Court proceedings are far from completed, they are fairly well along after ten hearings.  The many detailed arguments and declarations reviewed by the Superior Court demonstrate an in depth knowledge of these businesses as well as numerous attempts to ensure compliance with court orders.  The removal of the action to this court is clearly forum shopping after the loss of numerous rulings in Superior Court.

Determination of Ownership of Receivables

The quality of the receivables and what can be sold to benefit the creditors of these two estates is one of the central questions determining how much creditors will be paid. There was testimony concerning the possible improper transfer of Choice receivables, the improper crediting of payments for services rendered by another entity, the possible previous sale of the same receivables the receiver is attempting to liquidate, and the possible destruction of underlying records supporting the receivable entries.

The receiver alleges that M&C, among other entities, wrongfully billed for services that Choice performed. The receiver, in his state court pleadings, includes declarations detailing how M&C, and Malek, its former principal, replicated Choice's billing servers and used that information to bill clients. The receiver has filed numerous declarations detailing how he believed this happened.  See Exhibit 8 to "Receiver/Custodian's Response to Court's Order to Show Cause Re: Abstention or Dismissal" filed October 15, 2009; Exhibits 8 - 10 to Receiver's Request For Judicial Notice In Support of Motion For Order Remanding Removed Case" filed October 13, 2009. These allegations throw the validity of the accounts receivable into doubt.

Elizabeth Manahan testified and supplemented the declaration previously filed in Superior Court. She testified that Malek asked her to handle the accounts payable and receivable in a way she considered illegal.  She was in fear of her safety and stated that Malek personally threatened her.  She described services rendered by Choice that were then billed by M&C as well as instructions given to attorneys to make settlement checks out to M&C instead of Choice.  She also described multiple billing systems operated by Malek in order to evade the receiver.  She further described Malek's control of the mail in order to prevent the staff from properly crediting billings.  She said one reason doctors were not being paid timely was because Malek and Chahayed were telling attorneys to hold off paying until after the bankruptcy was closed.  Manahan was clearly afraid to testify but did so anyway. She was credible and supported her conclusions with details.

Ruth Bell, an employee shared by M&C and Choice also testified. Bell maintained the accounts payable for the businesses from February through November 2008 and reported to Malek for much of that time. She testified that Malek decided where to deposit any checks that came in, and often the payee on the check did not correspond to the account into which it was deposited. Checks made out to Choice were often deposited into non-Choice accounts.  Bell raised this problem with both Malek and Chayehed.  Malek hired his mother to handle the mail and the deposits but Bell took care of this when his mother was not there. Bell deposited the checks into the accounts that corresponded to the service provided, but Malek corrected her and then removed her from that function. Bell authenticated numerous 1099s where Choice's tax identification number was being used with the name of a different entity such as H&M Orthopedic or St. George Health Clinic. (See Exhibit 1 to Ruth Bell's testimony).  Bell was let go when the receiver took over.  She was credible and appeared not to be partial to either the receiver or Malek but to be frustrated that she was never permitted to carry out her job properly.

The determination of ownership of the receivables is further complicated by indications that Malek may have sold either Choice's or M&C's receivables to a third party shortly after the receiver took over.  The receiver presented credible information that Malek received at least $650,000 for these receivables and that the buyer's collection efforts may be in conflict with those of the receiver.  Malek appears to be claiming through Davidoo and Morales that these were receivables of H&M Orthopedic or other entities, but he never clarified the matter.  He did offer to pay back $20,000 of diverted funds to the receiver but has not accounted for any other receivables the receiver is tracing.

The identification of receivable ownership requires tracing the medical file and activity that corresponds to each bill.  In addition to the computer billing entries, a surgery file was maintained for each patient.  Jenkins testified that 90% of the surgeries were unaccounted for in the Choice files because of missing records. While he believed the files were shredded because of shredded files the receiver found upon takeover, Morales testified that the files were only shredded once they were imaged.  No one explained why the receiver has not been

able to locate the imaged files.  In any case, it is clear that piecing together the support for the

receivables will not be an easy task.

Accountant Dee Steine, a petitioning creditor in the Choice case, testified that she had

been brought in by Malek to set up systems to run both Choice and M&C. She found the

accounting records incomplete or non-existent with no external controls at both M&C and

Choice. There was lots of turnover in the bookkeeping staff.  Files were in disarray and kept all

over the place. She agreed with Sumpter's testimony that medical receivable collections are

usually significantly less than the account receivable totals. She was not optimistic that Choice

could collect much more from the receivables to cover more than its tax debt.

The collection of any cash payments by Choice and its proper accounting is further

complicated by the Malek-Koshak dispute. Sylvia Morales testified that she was under

instructions from Koshak to give all cash that came in to him and not to tell Malek. Allen

Davidoo, an accountant who worked for various Malek entities over the last five years, denied

Manahan's allegations that he whited out payees on checks made out to Choice, but he did

report that he did extensive accounting work for Heritage and Guardian, other Malek owned

entities, while on the M&C payroll.  While the final determination of these issues cannot be

made with this limited record, the testimony established that either estate's claim to the

receivables is in doubt absent additional forensic work.

Costs of Resolving Current Disputes

The petitioning creditors in Choice argue that an unbiased trustee will administer the

estate for the benefit of creditors, cut the receiver's administrative fees, and administer the

estate for the benefit of unsecured creditors. The petitioning creditors do not specify how all of

this will occur with less than $10,000 in the alleged debtor's bank accounts.  The evidence

before the court indicates that the most likely way for unsecured creditors to realize a

distribution in either estate is if the forensic accounting can be completed, the accounts

allocated between Malek and Koshak, and any diverted funds collected. The estates may also

be able to make a profit through the current operation of these entities, although it is unclear

from this limited record if that is a feasible option.

If the cases continue in Chapter 7, any trustee would have to hire counsel and forensic

accountants. The counsel would need to familiarize herself with a nearly year long state court

proceeding and prepare for a contempt trial or duplicate similar litigation in this court. The

trustee would need to familiarize herself with the debtor's books and records to determine what

assets the estate has and what receivables various entities might have diverted.  In effect, the

appointment of a trustee would simply add another layer of fees to an estate that is already

being run for the benefit of creditors. Further, there are credible allegations that Malek diverted

money from Choice to entities other than M&C. A trustee would need to investigate these

allegations, file fraudulent transfer complaints, or file a complaint to bring those entities into the

estate. Most or all of these entities are already part of the state court receivership, so no

further litigation is needed to bring them into the resolution of this matter.

The test for §305(a) abstention is the best interest of creditors and the debtor. Keeping

both estates and the removed action with the receiver in state court would mean less litigation

over the accounts receivable because all companies with an interest in the receivables would

be managed by one entity.  A good bulk of the fees have already been incurred and would not

have to be duplicated.

It is puzzling why the petitioning creditors in Choice believe that the involuntary

bankruptcy will save expenses.  Under California law, the receiver has the ability to petition the

Superior Court to have the principals of the receivership entities pay the fees and costs of the

receivership.  Should the receiver file a claim for his fees and costs in the Choice estate, their

size could dwarf any recovery by the creditors in that case.  There is no similar mechanism

under federal law to shift payment of administrative fees to the principals of a debtor

corporation, so those fees come out of any recovery the creditors seek to share.

The receiver may possibly have a claim for his fees in the M&C case. There is also no reason to believe that the trustee and the trustee's attorney in the M&C bankruptcy will be more diligent in pursuing these claims than the receiver has been.  The trustee has little in either estate with which to pay professionals and does not have the option the receiver has to recover his fees from the principals of the debtors.

Payment To Creditors

In any scenario, unfortunately, payments to creditors will not occur until the underlying litigation is resolved.  The petitioning creditors in Choice have testified that they believe the bankruptcy case is the best way for them to get paid.  None of them had any understanding or experience with a state court receivership.  They simply know that they have not been paid by the receiver.  It is not clear that any of the petitioning creditors are aware of the risk involved in an involuntary case where the petitioning creditors can be found liable for the debtor's expenses in defending the petition.  See 11 U.S.C. §303(i).  There is no such risk by leaving the case in state court receivership.

The receiver is currently the court appointed guardian for Choice. The receiver may have the right to request the petitioning creditors to post a bond under §303(e) in order to continue with this case.  The receiver testified that Choice is seeing new patients every day and may be profitable once the assets he believes have been diverted are recovered. While it is too early to tell what the final accounting in Choice will be; it is precisely these unknown future solvency questions that give alleged debtors grounds to request a bond pending their determination.  Creditors have the right to request payment from the receiver in the Superior Court proceeding and would not be asked to post a bond.

Looking at the surface facts, M&C's schedules indicate that it has $3,000,000 in receivables, which can be liquidated for $1,000,000. The schedules also indicate that the debtor owns chiropractic equipment, which might be sold for $50,000 or more. Liquidating these assets would theoretically pay off the claims of taxing authorities, the costs of

receivership and most if not all of the claims scheduled by the debtor. Such a simple resolution, however, is chimerical.

Koshak, in the state court lawsuit, alleges that the debtor purchased much of the chiropractic equipment with funds misappropriated from Choice. Any attempt to sell this equipment would likely result in more litigation. The bankruptcy court would likely also need to analyze all of the accounts receivable and rule on which parties provided which services. Even if the trustee could sell the receivables in bulk, the court would likely need to escrow all monies paid and make a determination as to the ownership of the money. These issues would require significant litigation and create large administrative expenses, paid before any unsecured creditor.

In addition to the liquidation issues, the M&C estate would be subject to prolonged litigation just to determine what parties have claims against the estate.  Koshak sued M&C, among other parties, for at least $600,000. The litigation has been going on for more than a year and there is no trial date set. The litigation involves multiple defendants and a cross-complaint. The complexity of the lawsuit would make it difficult, if not impossible for this court estimate the amount of the claim. Therefore, all creditors would have to wait for the state court litigation to finish before the trustee could make payouts to unsecured claimants.

Jeff Sumpter testified as an expert witness on behalf of Haney Malek that the best way for creditors to get paid was to keep both cases in bankruptcy.  Mr. Sumpter is a Certified Public Accountant, holds a J.D. and is clearly qualified as a forensic accountant experienced in bankruptcy cases. (See Exhibit 4 to Jeff Sumpter's testimony).  He has had a lot of experience representing trustees and providing expert testimony in fraud cases and other complex litigation. He was retained approximately ten days before the hearing by Malek to render an expert opinion as to whether the creditors in the two bankruptcies cases were better served by a liquidation in bankruptcy or by the receivership proceeding.  (It appears that he may have originally been retained to focus on some checks and some allegations in the receiver's contempt motion, but then turned to the matters raised in this hearing.)   His opinion was that

keeping the cases in Chapter 7 bankruptcy would result in sufficient funds to pay the trustee and the creditors. He based his conclusions on five summary charts compiled from the receiver's records consisting of Choice's Receivables (exhibit 5), Choice's Profit & Loss Statement (Exhibit 6), Choice's Accounts Payable Aging Summary (Exhibit 7), M&C's Profit & Loss Statement (Exhibit 8), and M& C's Accounts Payable Aging Summary (Exhibit 9)  as well as the Receiver's Seventh Interim report for July (Exhibit 10).  Based on his review of these documents and interviews of Malek and Marquez, Sumpter believes that the net losses in the continuing operation of these entities justify closing them down.

One assumption underlying Sumpter's conclusion is that the Chapter 7 trustee can hire the same professionals as the receiver so that they can avoid the loss of the expertise gained so far by the receiver's team.  This ignores the question of whether these professionals may serve, given the large unpaid debt Choice and/or M&C may owe them for pre-petition services.  See 11 U.S.C. §327(a).  This also ignores the body of knowledge already acquired by the receiver and Superior Court Judge Latin over the last ten months.

Mr. Sumpter accurately described possible scenarios which certainly are regularly employed in bankruptcy courts.  He was rightfully concerned about mounting losses from continuing operations as well as aging receivables.  He believed that a liquidation with collection of the receivables before they aged any further would increase disbursements to creditors.  Under normal circumstances, the court would agree with such an approach, as this is the usual procedure in a Chapter 7 case.

The source of Sumpter's information about the state of the receivables, however, was Malek and Marquez.  He admitted that his review was limited to just a few hours on the morning of the hearing of the records the receiver had compiled over many months.  He did not address some critical issues related to collecting the receivables.  He did not speak to any of the witnesses who had testified at the hearing.  He did not appear to be aware of the difficulties a trustee would encounter in any attempt to sell either estate's receivables.

While the scenario described by Sumpter is appealing on the surface, his opinion was not persuasive. He appears to have been provided with none of the underlying documentation for either the payables and receivables of each company. He was also not aware that the receivables might have already been sold and the proceeds taken by Malek. He did not appear to know that the receiver has challenged many of the payables listed in Choice's accounts payable as improper loans taken out by Malek.  If the ownership of the receivables is at issue, a speedy liquidation is not possible.  If the losses in operations are greater than they should be because of improper payables, the question of whether the entities should keep operating is a much closer one.

M&C argues that the best way to pay creditors is to get the insiders bidding against each other for the receivables.  They argue this is a regular occurrence in bankruptcy cases and provides a good test of what the receivables are worth.  As appealing as such a simple solution sounds, there are two problems with that approach.  The trustee cannot sell assets which the estate does not clearly own  *In re Manning*, 831 F.2d 205, 207 (10th Cir.1987), and there are significant questions here as to what entities own both estates' receivables. Secondly, significant evidence has been introduced demonstrating that Haney Malek has diverted receivables from Choice into M&C and other Malek controlled entities.  Without a final determination of that question, any insider bidding war would be unfair and inappropriate.

Core Proceedings/Bankruptcy Purpose

M&C's counsel argues that the voluntary bankruptcy meets a core bankruptcy purpose in that even a solvent estate properly avails itself of bankruptcy where a dispute involving a principal of the debtor threatens to ruin the business if not resolved.  M&C seeks to have the dispute between Malek and Koshak resolved in this court and then liquidate assets and pay creditors.   As explained above, this theory is simply not viable given the duplicative costs it would entail and the lack of any speedy way to administer these estates.

Choice's petitioning creditors have made out a preliminary case that Choice indeed is not paying its debts as they become due. Elizabeth Manahan, who now assists the receiver in

running M&C and Choice, testified that doctors were not being paid because insufficient income was being generated on an ongoing basis right now. A few creditors testified that they had not been paid substantial sums.  Mr. Pasternak testified that all post-petition payments were current but that prepetition debts cannot be paid yet. Mr. Jenkins represented that he was current with debts that arose after the receivership took over, but that he has only just started to pay pre-receivership debts.

There really was no contradiction of Mr. Pasternak's testimony that all creditor claims could be resolved as part of the state receivership proceeding, that assets could be sold if appropriate there, that interested parties had an equal right to be heard as in this court and that creditors could request modifications to the state court receivership order.  In fact, Dee Steine testified that she did not consider the state law protections of a receivership estate when she signed on to the involuntary bankruptcy petition.

Clearly, one great advantage in a bankruptcy proceeding is the relief afforded a debtor under the automatic stay afforded by 11 U.S.C. §362.  There is no automatic stay in effect in the receivership proceedings.  It appears, however, that this has not presented any problems in administering these cases as the receiver's attorneys are addressing each of the lawsuits against these entities and an equivalent prohibition keeps the Internal Revenue Service from levying on receivership assets to pay its large tax claim.

M&C argues that a great advantage of a bankruptcy proceeding is the ability to sell assets both free and clear of liens under 11 U.S.C. § 363(f) as well as the attraction to potential buyers of thwarting any reversal of the sale order on appeal where a finding of good faith is made under section 363(m).  While this is true, the only offer thus far for any assets appears to be a Malek-related entity and any good faith finding would be impossible on this record.  Secondly, as Mr. Pasternak testified without contradiction, the state court has the ability in the receivership to make similar findings and authorize a sale providing good and valid title to any buyers as well.  Cal. Code Civ. Proc. 568.5; *People v. Riverside University*, 35 Cal App 3d 572 (1973, Cal App 4th Dist)

As to the remand question, the state court action removed to this court is not a core proceeding. The Ninth Circuit, in *In re Eastport Associates*, defined core proceedings as proceedings that cannot be brought without the existence of a bankruptcy case. 935 F.2d 1071, 1076-1077 (9th Cir. 1991). The state court action was brought pre-petition. It can be maintained whether or not the bankruptcy continues. The *Eastport* court also evaluated how important the proceeding was to the reorganization. *Id*. In *Eastport*, the court found that the case directly affected the ability of a single asset real estate case to reorganize. The removed case has no effect on M & C's reorganization. The debtors filed for chapter 7, M&C will terminate at the end of the bankruptcy proceedings no matter what occurs in the state case. The state case might delay full payment to creditors, but it will not impact the debtor's reorganization.

<u>Good Faith of the Filings</u>

The circumstances surrounding the voluntary filing of M&C raise suspicion that the filing was designed solely to defeat the receiver and allow Malek and Chahayed to continue operations under another entity. The debtor's statement of financial affairs indicates that the debtor made more than $1.3 million last year and was on track to make a similar amount this year.

There was also an immediate attempt to buy the personal property listed on Schedule B for $50,000. The bidding party suggested it might later be willing to buy the accounts receivable. The offer was unsolicited and came only five days after the debtor filed its schedules. The offer did not ask for any further information about the condition of the equipment or details about the equipment. This suggests that the offer was made by insiders attempting to use the bankruptcy code to strip liens and restart their business without the hassle of going through a Chapter 11 reorganization.

Dr. Malek's actions in using the M&C bankruptcy to stop the contempt hearing also supports a finding that the case was filed to prevent the receiver from pursuing Malek and not

to seek payment to creditors of M&C.  Although Malek is not a debtor and the contempt proceeding was against him personally, he removed the proceeding as an adversary related to the M&C bankruptcy case.  See Exhibit 7 to Receiver/Custodian's Response to Court's Order to Show Cause.

M&C's counsel argues that both Dr. Chahayed and Malek authorized the filing of M&C's bankruptcy and Dr. Chahayed has a right to have the dispute between Choice and Malek resolved. Dr. Chahayed has however, demonstrated little interest in these proceedings. Despite allegations of witness tampering following a specific court admonition about any witness intimidation, he declined to testify, and in fact did not attend the hearing when his testimony might have been requested. Despite signing the schedules, he has not appeared to explain why he sought bankruptcy protection for a company his schedules allege is quite solvent and profitable.  In fact, there has been no actual testimony offered from anyone on behalf of M&C.  Dr. Malek's counsel first stated he would testify and when the time came, he remained in the courtroom and his counsel represented that he had decided not to testify.  This followed days of testimony providing quite damaging evidence against him, and the court explained that he should be given every opportunity to refute the allegations made.  The failure of Drs. Malek and Chahayed to testify in support of their alleged proper purpose in filing the M&C case points to a less than forthright approach to this court.  There is really no actual evidence in this record to support the proper bankruptcy purpose argued by M&C's counsel.

As pointed out by the receiver's brief, the bad faith filing of the M&C case is supported by Malek's extensive history in the bankruptcy courts.  Malek first filed personal bankruptcy on April 15, 1996 – a Chapter 11 that was dismissed on July 11, 1996.  He filed a personal case again on July 24, 1998, and received a discharge on December 11, 1998. On February 25, 2009, he caused a Chapter 11 case to be filed for 11742 Sherman Way, LLC (Case 09-12038-KT.)  Secured creditor GECC brought a motion to dismiss alleging fraud and violations of cash collateral orders, and the case was dismissed on October 16, 2009.

There were allegations at the outset of arguments that the Choice involuntary petition was collusive.  The evidence has not shown that the creditors were colluding with Malek. Some of them may be somewhat loyal to him, but most of them such as Dr. Jeffrey Chavez just want to get paid.  They sincerely hold the belief that they are more likely to get paid in a bankruptcy proceeding than in the receivership proceeding.  They are operating in good faith, but it does appear they have not been advised of the various factors discussed herein.

Continuation of Operations

The receiver is now operating the business and is trying to pay all creditor claims from both liquidaton of past receivables and future income. Choice is seeing new patients every day and may be a viable ongoing business. The reports indicate that the receiver has restarted or will restart Choice's sleep lab. Under the receiver's continued operation, Choice has a chance of surviving the litigation and continuing to operate and generate money.  A chapter 7 proceeding terminates the debtor and leaves no chance of the debtor's continued existence.

The receiver testified that 40 new patients were seen by M&C last month despite indications that Malek has told referral sources to stop referring patients to M&C.   While the operations must still be evaluated, it appears premature to shut the business down where the receiver believes it may still be viable.

There are significant problems with having either estate remain here in Chapter 7. Once they are in bankruptcy, the trustee will need to show why they should be an operating business in order to continue running them as the receiver is now doing. A very experienced interim trustee for the M&C case has already indicated no desire to operate the clinic and has stipulated to just allow the receiver to continue for now.  If the businesses are shut down, as is likely without the receiver, there is no hope of creditor payment out of new receivables and no immediate source of payment from past receivables. The continuity of operations is more likely for now with the receiver and, until a more thorough analysis of the receivables can be completed, is a preferable situation over immediate closure of the businesses.

## Non-Bankrupt Parties

The state court action involves a number of non-debtor parties. The state court action involves a number of corporate entities and a number of individuals. The state case still involves  Malek,  Koshak, Bank of America, Reseda Check Cashing and other entities that are not parties to any bankruptcy. While these entities may be brought into the bankruptcy cases, it is likely substantive consolidation would be necessary to properly resolve the lack of recordkeeping, purposeful ignorance of corporate formalities and accounts receivable diversions testified to in this hearing.  Such a process would be costly and lengthy, and the receiver has effectively already accomplished the equivalent in state court.


## Conclusion

Both Choice and M&C might survive outside of bankruptcy resulting in ongoing businesses that keep jobs and operations in the community and increase the likelihood that creditors will be paid more than pennies on the dollar. The receiver has been involved in this case for almost a year and can resolve matters properly in the same way a trustee could in a bankruptcy proceeding. Resolution of the disputed accounts receivable is likely to happen more quickly if the cases stay in the court they have been in.  There are strong indications in the M&C voluntary case of forum shopping and delay tactics that should not be permitted. There are numerous parties who may be affected by actions in these two bankruptcy cases who are neither debtors nor creditors of either estate, raising significant concerns in a court of limited jurisdiction.  For all of these reasons, the court will dismiss both bankruptcy cases under 11 U.S.C. §305(a) and remand the adversary proceeding to Los Angeles Superior Court.

DATED: November 16, 2009

_____
United States Bankruptcy Judge

**NOTE TO USERS OF THIS FORM**:

**1)**  Attach this form to the last page of a proposed Order or Judgment.  Do not file as a separate document.
**2)**  The title of the judgment or order and all service information must be filled in by the party lodging the order.
**3)  Category I.** below:  The United States trustee and case trustee (if any) will always be in this category.
**4)  Category II.** below:  List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief.  <u>DO NOT</u> list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) **MEMORANDUM OF DECISION**

**re: Dismissal**

was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of_____, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below:

- Raymond H Aver     ray@averlaw.com
- Alan W Forsley     awf@fredmanlieberman.com
- David Keith Gottlieb     dkgtrustee@horwathcal.com, CA5A@ecfcbis.com
- Charles Shamash     cs@locs.com, generalbox@locs.com
- Jeffrey S Shinbrot     shinbrot@earthlink.net
- Marcus Tompkins     mtompkins@sulmeyerlaw.com, jbartlett@sulmeyerlaw.com
- United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

**MALEK AND CHAHAYED CHIROPRACTIC CORP.**
11024 Balboa Blvd., # 429
Granda Hills, CA 91344

Harry Nelson
Fenton & Nelson LLP
11835 W Olympic Blvd Ste 925
Los Angeles, CA 90064

☐ Service information continued on attached page

**III.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below: